**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

**LAND RESOURCE, LLC,**

              **Debtor.**

_____

**REALAN INVESTMENT PARTNERS,**
**LLLP and WEEKS-GREY ROCK, LLC,**

              **Appellants,**

v.                                                    **Case No:  6:13-cv-476-Orl-36**

**LEIGH R. MEININGER, as Chapter 7**
**Trustee of the Estates of Land Resource,**
**LLC and Its Affiliated Debtors,**

              **Appellee.**

_____

## OPINION AND ORDER

        This cause comes before the Court upon Appellants Realan Investment Partners, LLLP

("Realan") and Weeks-Grey Rock, LLC's ("Weeks-Grey" and, together with Realan,

"Appellants") appeal of the bankruptcy court's Order (Doc. 1-3) approving two agreements

entered into by Leigh Richard Meininger as Chapter 7 trustee (the "Trustee") of the bankruptcy

estates of the debtors, Land Resource, LLC ("Land Resource") and certain of its subsidiaries (the

"Debtors"):  (1) an agreement between the Trustee and various parties in the Ward Litigation

described below (the "Ward Settlement Agreement"); and (2) an agreement between the Trustee,

on the one hand, and Bond Safeguard Insurance Company and Lexon Insurance Company

(collectively, the "Bond Safeguard Parties"), on the other hand (the "Euram Litigation

Agreement").  The Appellants filed a brief in support of their appeal (Doc. 11), and the Trustee

submitted an answer brief in opposition to the appeal (Doc. 22). On November 12, 2013, the Court held oral argument on the appeal. *See* Doc. 26. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158. Upon due consideration of the record, the briefs, and the oral argument, the Court has determined that the bankruptcy court's Order should be affirmed.

## I.   BACKGROUND

### A.   The Debtors' Bankruptcies, the Ward Litigation, and the Euram Litigation

The Debtors, including Land Resource, are affiliated companies that developed vacation and second-home residential communities in the Southeast United States. Doc. 1-3 at 2. Robert Ward was the CEO and principal owner of Land Resource, and he served as the indemnitor for certain bonds issued on behalf of Land Resource. *See* Compl. ¶ 13, *Bond Safeguard Ins. Co. et al. v. James Robert Ward et al.*, No. 6:11-cv-641 (M.D. Fla. Apr. 19, 2011). On October 30, 2008, the Debtors filed separate voluntary petitions under Chapter 11 of the Bankruptcy Code, which were eventually converted to cases under Chapter 7 and ordered to be jointly administered on July 21, 2009. Doc. 1-3 at 2. A few years prior to the Debtors' bankruptcy filings, Realan and Weeks-Grey had each invested approximately $1 million in one of the Debtors, LR Buffalo Creek, LLC ("Buffalo Creek"). *See* Appellants' Br. 2.

After the bankruptcy filings, the Trustee and the Bond Safeguard Parties separately commenced several actions against Robert Ward and certain of his family members and related entities (the "Ward Parties") with the intent of recouping assets which had allegedly been fraudulently transferred from the Debtors to the Ward Parties. For one, the Trustee filed a claim on behalf of the Debtors in a Florida probate action involving the estate of Robert Ward's deceased wife, Diane Elizabeth Ward (the "Probate Action"). *See In re Estate of Diane Elizabeth Ward*, No. 2009-CP-002635-O (Fla. 9th Cir. Ct. July 21, 2010). The Trustee also commenced two separate adversary proceedings against the Ward Parties, alleging that they had been the

beneficiaries of fraudulent transfers (the "Adversary Proceedings").  *See* Compl., *Meininger v. J. Robert Ward* (*In re Land Resource, LLC*), No. 6:10-ap-276 (Bankr. M.D. Fla. Oct. 29, 2010); Am. Compl., *Meininger v. Sarah Caitlin Ward et al.* (*In re Land Resource, LLC*), No. 6:10-ap-275 (Bankr. M.D. Fla. Oct. 29, 2010).  In addition, the Bond Safeguard Parties, which had issued bonds on behalf of Land Resource and its subsidiaries prior to the bankruptcy filings, commenced two separate actions of their own against the Ward Parties in federal district court (the "Bond Safeguard Lawsuits").  *See* Compl., *Bond Safeguard Ins. Co. v. Diane Elizabeth Ward et al.*, No. 6:09-cv-1504 (M.D. Fla. Sept. 1, 2009); Compl., *Bond Safeguard Ins. Co. et al. v. James Robert Ward et al.*, No. 6:11-cv-641 (M.D. Fla. Apr. 19, 2011).  There are also two other cases involving the Ward Parties and the Bond Safeguard Parties, one involving a writ of attachment in Georgia (the "Georgia Writ Action") and the other involving a garnishment action in Florida (the "Florida Garnishment Action").  *See Bond Safeguard Ins. Co. v. James Robert Ward*, No. 1:09-cv-1858 (N.D. Ga. Oct. 8, 2009); *Bond Safeguard Ins. Co. v. James Robert Ward et al.*, No. 2011-CA-011116-O (Fla. 9th Cir. Ct. Aug. 31, 2011).  The foregoing actions are collectively referred to as the "Ward Litigation."

The Trustee also commenced an adversary proceeding (the "Euram Litigation") against various joint venture partners of the Debtors that had allegedly been the beneficiaries of fraudulent transfers while the Debtors were insolvent.  *See* Compl., *Meininger v. Euram, LLC et al.* (*In re Land Resource, LLC*), No. 6:10-ap-273 (Bankr. M.D. Fla. Oct. 29, 2010).  Realan and Weeks-Grey were among the joint venture partners named as defendants in the Euram Litigation.  *See id.*

### B.     The Ward Settlement Agreement

On May 1, 2012, the Trustee filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019[1] seeking the bankruptcy court's approval of a settlement agreement between the Trustee and the Ward Parties.  *See* Doc. 2; *id.* Ex. 1 ("Original Settlement Agreement").  The settlement agreement was later supplemented to add certain terms and to add the Bond Safeguard Parties as parties to the agreement, and on November 7, 2012, the Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking the bankruptcy court's approval of this supplemented agreement (the "Ward Settlement Agreement").  *See* Doc. 3-1; *id.* at 11–22 ("Supplement").  Under the terms of the Ward Settlement Agreement, the Ward Parties agreed to pay $925,000 to the Trustee in exchange for the Trustee's voluntary dismissal or withdrawal of the Debtors' claims in the Probate Action and the Adversary Proceedings, as well as a mutual release and settlement of all claims related to the claims in those proceedings.  *See* Original Settlement Agreement §§ 3, 4, 6; Supplement § 1(c).[2]  The Ward Parties also agreed to cooperate with the Trustee in any disputes arising from the Debtors' bankruptcies.  *See* Original Settlement Agreement § 3.  Moreover, and of particular relevance to this appeal, the Trustee agreed to seek a bar order and channeling injunction from the bankruptcy court (the "Bar Order") that would permanently enjoin the Trustee and the Debtors' creditors from pursuing any claims against the Ward Parties arising from, related to, based upon, or deriving from the Debtors' business activities.  *See id.* § 5.

---

[1] Bankruptcy Rule 9019(a) provides:  "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."  Fed. R. Bankr. P. 9019(a).

[2] The Ward Parties also consented to the entry of a final judgment against them in the Adversary Proceedings in the amount of $300,000.  *See* Supplement § 1(d).  The consent judgment would be held by the Trustee in escrow pending the Trustee's receipt of the settlement payments from the Ward Parties, at which point the consent judgment would be void.  *Id.*

In addition, the Ward Settlement Agreement provided the Bond Safeguard Parties with a limited carve-out from the Bar Order in the form of a "Coblentz Agreement"[3] between the Bond Safeguard Parties and the Ward Parties. *See* Supplement § 1(a); Doc. 3-1 at 23–37 ("Coblentz Agreement"). Under the Coblentz Agreement, the Bond Safeguard Parties retained the right to pursue a consent judgment of $40,410,729.03 in the Bond Safeguard Lawsuits, with the proceeds to be satisfied solely from Robert Ward's insurer. *See* Coblentz Agreement §§ 2–5, 8. The Ward Settlement Agreement further provided that 90% of any net recovery (after reimbursement to the Bond Safeguard Parties of their professional fees and costs) from the insurer in the Bond Safeguard Lawsuits would be paid to the Bond Safeguard Parties, with the remaining 10% to be paid to the Trustee. *See* Supplement § 2(b). The Bond Safeguard Parties also agreed to dissolve the writ of attachment it had obtained against Robert Ward in the Georgia Writ Action. *See* Coblentz Agreement § 6(c). The Trustee asserted that the Ward Settlement Agreement, in conjunction with the Euram Litigation Agreement described below, would result in an approximately $50 million reduction in the Bond Safeguard Parties' allowed claims against the Debtors—from $89,778,000.02 to $41,918,810.21—as well as a reclassification of such claims from administrative priority claims to general unsecured claims. *See* Doc. 3-1 at 7; Doc. 3-2 Ex. 1 ("Euram Litigation Agreement") § VIII.

### C.     The Euram Litigation Agreement

On November 7, 2012, the Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking the bankruptcy court's approval of a separate agreement between the Trustee and the Bond

---

[3] This type of agreement, first recognized in *Coblentz v. American Surety Co. of New York*, 416 F.2d 1059 (5th Cir. 1969), involves an agreement for entry of a consent judgment against an insured in situations where the insurer declines to defend or offers to defend under a reservation of rights. *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co.*, 601 F.3d 1143, 1147 n.2 (11th Cir. 2010). In return for a stipulated judgment, the claimant agrees not to execute against the insured. *Id.*

Safeguard Parties (the "Euram Litigation Agreement").   *See* Doc. 3-2; Euram Litigation Agreement.   Under the terms of the Euram Litigation Agreement, the Bond Safeguard Parties agreed to fund all of the professional fees and costs up to $750,000 associated with or related to the Trustee's prosecution of the Euram Litigation.   *See* Euram Litigation Agreement § II.   In exchange, the Bond Safeguard Parties would receive a specified portion of any award or settlement in the Euram Litigation, as set forth in a distribution schedule.   *See id.* §§ II(a)(4), III–VI.   For example, with respect to the first $300,000 in professional fees and costs funded by the Bond Safeguard Parties, the Bond Safeguard Parties would receive:   80% of any net recovery (after reimbursement to the Trustee of any outstanding professional fees and costs and reimbursement to the Bond Parties of the amount funded) up to $1,000,000; 55% of any net recovery between $1,000,001 and $2,000,000; 45% of any net recovery between $2,000,001 and $3,000,000; and 35% of any net recovery in excess of $3,000,000, with the balance in each case to be retained by the Trustee.   *See id.* § III.[4]   The Trustee would maintain ultimate control over the prosecution of the Euram Litigation, but would be required to provide monthly updates to the Bond Safeguard Parties and consult with the Bond Safeguard Parties prior to settlement or dismissal of any portion of the Euram Litigation.   *See id.* § II(a)(1) & (2).   If the Bond Safeguard Parties did not agree with a decision by the Trustee to settle or dismiss any portion of the Euram Litigation, the Bond Safeguard Parties would have the option to either (1) prosecute their own objections in the bankruptcy court proceedings or (2) pay the Trustee the proposed settlement amount, continue to fund the Euram Litigation in whole, and retain settlement authority over the specific compromise

---

[4] The Trustee's law firm agreed to freeze its hourly rates to those in effect in 2012 for the duration of the Euram Litigation.   *See* Euram Litigation Agreement § II(a)(5).

of the Euram Litigation to which they objected, while maintaining the right to collect 100% of any recovery resulting from that aspect of the Euram Litigation. *See id.* § VII.

### D.     The Bankruptcy Court Proceedings

Realan and Weeks-Grey filed objections to the Trustee's motions to approve the Ward Settlement Agreement (in both its original form and as supplemented), arguing that the Bar Order could be entered only in an adversary proceeding, and that the bankruptcy court had neither the judicial authority nor subject matter jurisdiction to enter the Bar Order. *See* Docs. 2-3, 3-6.  In addition, Realan and Weeks-Grey argued that the Bar Order was overbroad because it would extinguish claims that third parties, such as themselves, had against the Ward Parties that arose independently of the Debtors' business activities. *See* Doc. 2-3.  For example, Realan and Weeks-Grey asserted that the Bar Order would enjoin them from bringing state law claims for fraud arising out of representations made by the Ward Parties in connection with the sale of interests in Buffalo Creek to Realan and Weeks-Grey. *See id.*  Lastly, Realan and Weeks-Grey objected to the Ward Settlement Agreement's lack of a proposed allocation of settlement proceeds among the Debtors. *See id.*

Realan and Weeks-Grey also filed an objection to the Trustee's motion to approve the Euram Litigation Agreement. *See* Doc. 3-6.  First, they asserted that the Euram Litigation Agreement would improperly excuse the Trustee's counsel from filing fee applications and obtaining court approval of requested fees. *See id.*  Second, they claimed that the Euram Litigation Agreement amounted to an improper sale of the Trustee's rights in the Euram Litigation to the Bond Safeguard Parties and was not in the best interest of the Debtors' estates. *See id.*

On January 22, 2013, the bankruptcy court entered an Order overruling Realan and Weeks-Grey's objections and approving both the Ward Settlement Agreement and the Euram Litigation Agreement. *See* Doc. 1-3.  With respect to the Bar Order, the bankruptcy court concluded that it

had the authority and jurisdiction to enter the Bar Order because there was a nexus between the barred claims and the bankruptcy case. *Id.* at 6. The bankruptcy court found that the Bar Order was fair and equitable because it would save the Debtors' estates considerable litigation costs and provide them with a cash payment. *Id.* Moreover, the bankruptcy court concluded that the Bar Order was not overbroad because it did not bar claims unrelated to the Debtors' business activities. *Id.* at 6–7. The bankruptcy court, therefore, found that the Ward Settlement Agreement was fair, reasonable, and in the best interest of the estates. *Id.* at 7. The bankruptcy court made the same finding with respect to the Euram Litigation Agreement, opining that without the agreement, the estates would not have sufficient funds to effectively pursue the Euram Litigation. *Id.* Moreover, the estates would lose nothing if the Euram Litigation was unsuccessful. *Id.* On February 5, 2013, Realan and Weeks-Grey filed a Notice of Appeal of the bankruptcy court's order, giving rise to the instant appeal. *See* Doc. 1-1.

## II.   STANDARD OF REVIEW

The district court functions as an appellate court in reviewing decisions of the bankruptcy court. *In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the bankruptcy court are reviewed *de novo*. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). Findings of fact are reviewed for clear error. *Id.* "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (internal citations and quotations omitted). However, a bankruptcy court's decision to approve a settlement agreement is reviewed under the abuse of discretion standard. *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009).

## III.    DISCUSSION

### A.    Legal Framework

In deciding whether to approve or disapprove a proposed settlement, a bankruptcy court must consider the four factors set forth by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544 (11th Cir. 1990):

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* at 1549.  A bankruptcy court does not abuse its discretion in approving a settlement agreement unless the agreement "fall[s] below the lowest point in the range of reasonableness."  *In re Martin*, 490 F.3d 1272, 1275 (11th Cir. 2007).

When a settlement agreement contains a bar order, additional inquiry is required.  First, the bankruptcy court must determine whether it has subject matter jurisdiction over the barred claims. *In re Munford, Inc.*, 97 F.3d 449, 453 (11th Cir. 1996).  For the bankruptcy court to exercise subject matter jurisdiction, there must be "some nexus" between the barred claims and the bankruptcy case.  *Id.*  The test is whether assertion of the claims proposed to be barred "could conceivably have an effect on the estate being administered in bankruptcy."  *Id.* (internal citations and quotations omitted).  In other words, the barred claims are sufficiently related to the bankruptcy case "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Id.* (internal citations and quotations omitted).

After determining jurisdiction, the bankruptcy court must decide whether the bar order is "fair and equitable."  *Id.* at 455.  In making such a determination, the bankruptcy court should consider:  (1) the interrelatedness of the claims that the bar order precludes; (2) the likelihood of

nonsettling defendants to prevail on the barred claim; (3) the complexity of the litigation; and (4) the likelihood of depletion of the resources of the settling defendants. *Id*.

### B. The Bankruptcy Court Did Not Err in Approving the Ward Settlement Agreement

#### 1. The Bankruptcy Court Had the Constitutional Authority to Approve the Ward Settlement Agreement and Its Bar Order

Appellants offer several arguments for why this Court should overturn the bankruptcy court's approval of the Ward Settlement Agreement. First, they assert that the bankruptcy court lacked the constitutional authority to enter a bar order prohibiting third parties from bringing state law claims against the Ward Parties, citing to the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). *See* Appellants' Br. at 9–10. The Trustee, on the other hand, maintains that the *Stern* Court's holding was a narrow one and does not impact a bankruptcy court's authority to enter a bar order in approving a settlement agreement. *See* Appellee's Br. at 8–10. After a thorough review of *Stern* and the cases interpreting it, this Court agrees with the Trustee.

In *Stern*, the Supreme Court considered whether a bankruptcy court had exceeded its statutory and constitutional authority by entering a final judgment on a state law counterclaim to a proof of claim that had been filed in the bankruptcy of Vickie Lynn Marshall ("Vickie"), known widely to the public as Anna Nicole Smith. 131 S. Ct. at 2600–01. The proof of claim had been filed by E. Pierce Marshall ("Pierce"), the son of Vickie's deceased husband, and sought recovery from Vickie's bankruptcy estate for a defamation claim filed by Pierce against Vickie in the same bankruptcy proceedings. *Id.* at 2601. Vickie's counterclaim to Pierce's proof of claim alleged that Pierce had tortiously interfered with an inheritance gift she expected from her husband. *Id.*

In a lengthy opinion, the Supreme Court first addressed the statutory question, holding that the bankruptcy court had the statutory authority to enter a final judgment on the counterclaim,

because the counterclaim was a "core proceeding" under 28 U.S.C. § 157(b)(2)(C) that arose under Title 11 or a case under Title 11.[5]  *Id.* at 2604–05.  The Court then turned to the constitutional question of whether a bankruptcy court judge, as a non-Article III judge, could enter a final judgment on the state law counterclaim without running afoul of Article III.  *See id.* at 2608–20. The Court referred to its seminal decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), where the Court held that the Bankruptcy Act of 1978 violated Article III in granting non-Article III bankruptcy judges the statutory authority to decide a state law contract claim against an entity that was not otherwise part of the bankruptcy proceedings. *Stern*, 131 S. Ct. at 2609–10 (citing *Northern Pipeline*, 458 U.S. at 87).  However, the *Stern* Court observed that the plurality in *Northern Pipeline* had recognized a category of cases involving "public rights" that Congress *could* constitutionally assign to non-Article III legislative courts for resolution.  *Id.* at 2610.  Under the *Northern Pipeline* plurality's iteration, the "public rights" exception extended "'only to matters arising between' individuals and the Government 'in connection with the performance of the constitutional functions of the executive or legislative departments . . . that historically could have been determined exclusively by those' branches."  *Id.* (quoting *Northern Pipeline*, 458 U.S. at 67–68).

The *Stern* Court, however, explained that its cases subsequent to *Northern Pipeline* rejected the limitation of the public rights exception to actions involving the Government as a party.  *Id.* at 2613.  Thus, the public rights exception could apply "to cases in which the claim at issue derives from a federal regulatory scheme . . . .  In other words, it is still the case that what makes a right

---

[5] Section 157 allows bankruptcy judges to enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1).  "Core proceedings" include "counterclaims by the estate against persons filing claims against the estate."  *Id.* § 157(b)(2)(C).

'public' rather than private is that the right is integrally related to particular Federal Government action." *Id.* The Court, by way of example, cited to its decision in *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568 (1985), where it held that a federal statute requiring compensation disputes between data-sharing companies to be decided by binding arbitration did not violate Article III, because "[a]ny right to compensation . . . results from [the statute] and does not depend on or replace a right to such compensation under state law." *Stern*, 131 S. Ct. at 2613 (citing *Thomas*, 473 U.S. at 584). Turning to the facts before it, the *Stern* Court concluded that Vickie's state law counterclaim did not fall within the public rights exception because her claimed right to relief did not flow from a federal statutory scheme and did not fit within any of the Court's other iterations of the exception. *Id.* at 2614–15.

The Court also went to great lengths to reject Vickie's argument that the bankruptcy court had the authority to enter a judgment on her state law counterclaim by virtue of the fact that the counterclaim was filed against Pierce's proof of claim in the bankruptcy proceedings. *Id.* at 2615–18. To the Court, the critical question was not whether a proof of claim had been filed, but rather "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618. In answering this question, the Court found that adjudication of Pierce's proof of claim for defamation would not necessarily resolve Vickie's counterclaim for tortious interference. *Id.* at 2617–18. Moreover, the Court concluded that Vickie's counterclaim was "in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding." *Id.* at 2618. Accordingly, the Court ruled against Vickie, holding that a bankruptcy court "lack[s] the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. The Court stressed that its holding was a "narrow"

one and that its decision did not "meaningfully change[ ] the division of labor" between bankruptcy courts and Article III courts.  *Id.*

Courts considering *Stern*'s reach have uniformly concluded that *Stern* had little impact on bankruptcy courts' authority to enter final orders and judgments on motions to approve a settlement pursuant to Bankruptcy Rule 9019, including those containing bar orders.  In *In re Okwonna-Felix*, No. 10–31663–H4–13, 2011 WL 3421561 (Bankr. S.D. Tex. Aug. 3, 2011), the bankruptcy court held that *Stern* did not deprive the court of the constitutional authority to enter a final order on a motion to approve a settlement of the debtor's state law breach of contract claim against his homeowner's insurance company.  *Id.* at *4–5.  The court reasoned that state law had no equivalent to Bankruptcy Rule 9019, and that resolution of the motion to approve the settlement was based entirely on federal bankruptcy law as developed by federal courts.  *Id.* at *4.  Therefore, *Stern* did not apply.  *Id.*[6]

In *In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd*, 2014 WL 103988 (2d Cir. Jan. 13, 2014), the district court considered the bankruptcy court's approval of a settlement and entry of a bar order arising from Bernard Madoff's multi-billion dollar Ponzi scheme and the ensuing bankruptcy of his securities firm, Bernard L. Madoff Investment Securities LLC ("BLMIS").  *Id.* at 472.  After BLMIS had been placed in liquidation, the bankruptcy trustee commenced adversary proceedings against certain alleged co-conspirators of Madoff (the "Picower Defendants").  *Id.* at 473–74.  The bankruptcy trustee eventually reached a settlement

---

[6] The court held that, alternatively, even if *Stern* governed, the public rights exception applied because the key issue in deciding whether to approve the settlement was the authority to exempt property from the estate under the Bankruptcy Code.  *Okwonna-Felix*, 2011 WL 3421561, at *5. Because this determination was inextricably tied to the federal bankruptcy scheme and involved the adjudication of rights created by the Bankruptcy Code, the court concluded that the public rights exception allowed it to enter a final order on the motion.  *Id.*

with the Picower Defendants whereby the trustee would dismiss the adversary proceedings in exchange for a substantial payment by the Picower Defendants to the BLMIS estate.  *Id.* at 476. As a condition of the settlement, the trustee agreed to seek a bar order prohibiting claims against the Picower Defendants that were derivative of claims that could have been brought by the trustee. *Id.*  Two individuals who had sued the Picower Defendants in a separate action, and whose claims would be barred, objected to the settlement and bar order.  *Id.*  The bankruptcy court granted the trustee's motion to approve the settlement and the bar order, and the two individuals appealed.  *Id.* On appeal, the district court affirmed.  *Id.* at 491.  The district court, emphasizing the narrow holding in *Stern*, rejected the argument that the bankruptcy court lacked the constitutional authority to approve the settlement.  *Id.* at 483 n.5.  In the district court's view, *Stern* dealt only with a bankruptcy court's entry of a final judgment, and therefore did not intrude on bankruptcy courts' authority to approve settlement agreements under Bankruptcy Rule 9019.  *Id.*

Finally, in *In re Ambac Financial Group, Inc.*, No. 10–B–15973 (SCC), 2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d Cir. 2012), the debtor filed a motion pursuant to Bankruptcy Rule 9019 to approve a settlement with shareholders who had filed class actions against the debtor.  *Id.* at *1.  The settlement was conditioned on receiving a bar order from the bankruptcy court releasing and barring claims asserted in separate shareholder derivative actions against the debtor's officers and directors.  *Id.*  The plaintiff in one of those shareholder derivative actions, whose claims would be barred, objected to the settlement and bar order.  *Id.* After the bankruptcy court approved the settlement and entered the bar order, the plaintiff in the shareholder derivative action appealed.  *Id.*  On appeal, the district court affirmed, rejecting the argument that the bankruptcy court lacked constitutional authority to approve the settlement and enter the bar order.  *Id.* at *7.  The district court explained:

The full reach of *Stern* has yet to be determined, but it is clear that the case does not implicate the approval of settlements, relating to property of the debtor's estate, under Rule 9019.  It suffices to note that there is a fundamental difference between a court's entry of a final, binding judgment on the merits of a claim and its approval of a settlement of that claim.  *In re Wash. Mut.*, No. 08–12229(MFW), 2011 WL 4090757, at *4 (Bankr. D. Del. Sept. 13, 2011) (citing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 382, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996)); *see also Stern*, 131 S. Ct. at 2615 (emphasizing that "the entry of a final, binding judgment" is an exercise of judicial power).  While *Stern* may implicate a bankruptcy court's authority to effectuate the former, it does not affect the court's ability to engage in the latter.   Indeed, the permissive standard that bankruptcy courts apply in reviewing settlements under Rule 9019—whether the settlement is above "the lowest point in the range of reasonableness"—illuminates the distinct nature of settlement review as compared to final adjudication.  *In re Wash. Mut.*, 2011 WL 4090757, at *5.  Thus, there was no constitutional infirmity in the bankruptcy court's issuance of the 9019 Order.

*Ambac*, 2011 WL 6844533, at *7.  *See also In re ISE Corp.*, No. 10-14198 MM 11, 2012 WL 1377085, at *4 (Bankr. S.D. Cal. Apr. 13, 2012) (concluding that the court had constitutional authority to enter a final order on a motion for settlement pursuant to Bankruptcy Rule 9019 because "*Stern* . . . and its narrow limit on bankruptcy court jurisdiction does not extend to the compromise and settlement of a claim which is indisputably property of a debtor's estate."); *In re Washington Mut., Inc.*, 461 B.R. 200, 213–17 (Bankr. D. Del. 2011) (concluding that *Stern* did not deprive bankruptcy courts of the constitutional authority to enter final orders on motions to approve settlements, because approval of settlements by such courts is a "firmly established historical practice," and there is a fundamental difference between approval of settlement claims and a ruling on the merits of the claims).[7]

---

[7] Another court, while not directly addressing motions to confirm a compromise under Bankruptcy Rule 9019, discussed the effect of *Stern* on bankruptcy courts' authority to enter final orders and judgments in other "core proceedings" under 28 U.S.C. § 157.  *See In re Safety Harbor Resort & Spa*, 456 B.R. 703 (Bankr. M.D. Fla. 2011).  In *Safety Harbor*, the bankruptcy court, in confirming a Chapter 11 plan, concluded that it had the constitutional authority to approve a creditor's proposed "lock-up" restrictions on non-debtor guarantors of the debtor, where the plan included an injunction protecting the guarantors from being sued on the guaranties.  *Id.* at 719.  The court observed that the *Stern* opinion, which addressed bankruptcy courts' authority to enter final judgments on state law counterclaims under § 157(b)(2)(C), did not purport to limit bankruptcy

This Court agrees with these precedents and concludes that *Stern* should not be extended beyond its narrow holding.   The *Stern* Court merely held that bankruptcy courts lack the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.   *Stern*, 131 S. Ct. at 2620.   The Supreme Court emphasized that it was only addressing the "narrow" question before it, that Congress had exceeded the limitations of Article III "in one isolated respect," and that the Court's holding did not "meaningfully change[ ] the division of labor" between bankruptcy courts and Article III courts.   *Id*.   Thus, there is no reason to believe that *Stern* intended to limit bankruptcy courts' authority to approve settlements of claims that are property of the debtor's estate.   Moreover, in this case, the bankruptcy court did not enter a judgment on the merits of any of Appellants' potential state law claims against the Ward Defendants.   Rather, the action taken by the bankruptcy court was approval of a settlement agreement pursuant to Bankruptcy Rule 9019.   In contrast to the state law counterclaim at issue in *Stern*, the approval of a settlement agreement is governed by the Federal Rules of Bankruptcy Procedure and federal case law interpreting those Rules. Accordingly, *Stern* is inapposite.   Appellants are therefore incorrect in asserting that the bankruptcy court exceeded its constitutional authority in approving the Ward Settlement Agreement and the Bar Order.

2.   *The Bankruptcy Court Had Subject Matter Jurisdiction to Approve the Bar Order*

Appellants next argue that the bankruptcy court lacked subject matter jurisdiction to enter the Bar Order, contending that the bankruptcy court erroneously applied *Munford*, *supra*, in

---

courts' authority to adjudicate other "core proceedings," such as a confirmation of a plan under § 157(b)(2)(L).   *Id.* at 715–19.   Because the "lock-up" restrictions were an integral part of the bankruptcy court's order confirming the plan, the court concluded that it had authority to impose the restrictions.   *Id.* at 719.

holding that the enjoined claims had a nexus to the Debtors' cases.  *See* Appellants' Br. at 7–9.  In *Munford*, a Chapter 11 debtor in possession commenced an adversary proceeding against a valuation firm, a bank, former officers and directors, and certain shareholders, seeking to avoid transfers of property, disallow contract claims, and recover monetary damages arising from a leveraged buy out ("LBO") that allegedly forced the debtor into bankruptcy.  97 F.3d at 452.  The debtor alleged that the valuation firm failed to exercise reasonable care in issuing a solvency opinion in connection with the LBO, and that the debtor's payment to the valuation firm for its services constituted a fraudulent conveyance under state law.  *Id*.  The debtor alleged various state law claims against the other defendants.  *Id*.  The valuation firm offered to settle the debtor's claims against it for $350,000, contingent upon the bankruptcy court's issuance of a protective order permanently enjoining the other, nonsettling defendants from pursuing contribution or indemnification claims against the valuation firm.  *Id*.  The debtor agreed to the settlement terms and submitted the proposed settlement agreement and bar order to the bankruptcy court for approval pursuant to Bankruptcy Rule 9019.  *Id*.  After a fairness hearing, the bankruptcy court approved the settlement and entered the bar order.  *Id*.  On appeal, the district court affirmed the bankruptcy court's order, and the nonsettling defendants then appealed to the Eleventh Circuit.  *Id*.

The Eleventh Circuit concluded that the nonsettling defendants' pursuit of contribution or indemnification claims against the valuation firm could have conceivably altered the debtor's rights, liability, options, or freedom of action, and thereby impacted the handling and administration of the bankruptcy estate.  *Id*. at 453–54.  Without the bar order, the valuation firm would not have settled with the debtor and the debtor would have lost its right to collect $350,000 for the estate.  *Id*. at 454.  Therefore, there was a nexus between the adversary proceeding and the

nonsettling defendants' contribution and indemnity claims, and the bankruptcy court had subject matter jurisdiction to enter the bar order. *Id.*

Appellants argue that *Munford* is distinguishable because the bar order in that case only pertained to claims of co-defendants in an adversary proceeding against the settling defendant, whereas this Bar Order enjoins claims of entities that are not parties to the Ward Litigation. *See* Appellants' Br. at 7. However, since *Munford*, the Eleventh Circuit has expanded the reach of acceptable bar orders to include those enjoining third parties that are not involved in any adversary proceeding between the debtor and the settling defendant. In *In re Superior Homes & Investments, LLC*, 521 F. App'x 895 (11th Cir. 2013), the bankruptcy trustee of a Chapter 7 debtor commenced adversary proceedings against the debtor and its principals and affiliates (the "non-debtor defendants"), alleging that the debtor made fraudulent transfers to the non-debtor defendants. *Id.* at 897. The bankruptcy trustee determined that the non-debtor defendants had approximately $1,000,000 in assets available to satisfy a judgment entered against them, but the trustee was concerned that these assets would be exhausted by the non–debtor defendants' defense of state-court cases filed by 560 creditors of the debtor. *Id.* Those creditors sought to recover from the non-debtor defendants the allegedly fraudulent transfers made between the debtor and the non-debtor defendants. *Id.* In order to safeguard the $1,000,000 in assets for the benefit of the bankruptcy estate and all of its creditors, the trustee constructed a compromise that would result in the non-debtor defendants paying $800,000 to the estate in exchange for the entry of a bar order enjoining further litigation against the debtor and the non-debtor defendants, including the state court litigation by the 560 creditors. *Id.*

The trustee submitted the proposed settlement and bar order to the bankruptcy court, which approved the settlement and bar order over the objections of certain creditors. *Id.* Those creditors

appealed to this Court, which affirmed the bankruptcy court's order.  *Id*.  On further appeal, the Eleventh Circuit affirmed.  *Id*. at 899.  The court concluded simply that the state court litigation pursued by the creditors would directly impact the estate because the trustee would not have received the $800,000 settlement without the bar order.  *Id*. at 898.  Because there was a nexus between the enjoined litigation and the bankruptcy proceedings, the bankruptcy court had subject matter jurisdiction to approve the settlement and enter the bar order.  *Id*.  Appellants are therefore incorrect in asserting that a bankruptcy court does not have subject matter jurisdiction to enter a bar order enjoining third party claims.

Appellants also incorrectly argue that there is no nexus between the Debtors' bankruptcy proceedings and the claims enjoined by the Bar Order.  *See* Appellants' Br. at 8–9.  As the bankruptcy court noted, the Ward Parties and the Bond Safeguard Parties would not settle if the Bar Order was not included in the Ward Settlement Agreement.  Thus, the Trustee would lose the benefit of a substantial cash payment and cooperation from the Ward Parties, as well a significant reduction in the Bond Safeguard Parties' claims.  Without settlement, both the Debtors' estates and the Ward Parties would face continuing litigation costs, further reducing any recovery.  It is therefore quite clear that claims pursued by the Appellants related to the Debtors' actions could conceivably affect the Debtors' estates.  As in *Superior Homes*, a sufficient nexus exists between the enjoined claims and the bankruptcy proceedings, and the bankruptcy court had subject matter jurisdiction to enter the Bar Order.[8]

---

[8] Appellants also argue that the bankruptcy court's approval of the Bar Order outside the context of an adversary proceeding contravened Bankruptcy Rule 7001(7), which provides that proceedings to obtain an injunction are adversary proceedings.  *See* Appellants' Br. at 5–6.  However, the Eleventh Circuit has upheld bankruptcy courts' approval of bar orders submitted in conjunction with a motion for approval of a settlement pursuant to Bankruptcy Rule 9019, without the requirement that the bankruptcy court conduct adversary proceedings pursuant to Bankruptcy

3.        *The Bankruptcy Court Did Not Abuse Its Discretion in Approving the Ward Settlement Agreement and Its Bar Order*

Appellants' remaining assignments of error with respect to the Ward Settlement Agreement pertain to whether the bankruptcy court abused its discretion in approving the Ward Settlement Agreement and the Bar Order.  For example, in their fifth assignment of error, Appellants argue that the Bar Order was not fair and equitable as required under the *Munford* standard.  *See* Appellants' Br. at 11–13.  Under this standard, the bankruptcy court was required to consider:  (1) the interrelatedness of the claims that the Bar Order precludes; (2) the likelihood of nonsettling parties, such as Realan and Weeks-Grey, to prevail on the barred claims; (3) the complexity of the litigation; and (4) the likelihood of depletion of the Ward Parties' resources.  *See Munford*, 97 F.3d at 455.

Turning to the first factor, the bankruptcy court correctly concluded that the claims enjoined by the Bar Order are interrelated with the Debtors' bankruptcy proceedings.  Doc. 1-3 at 6–7.  The Bar Order only enjoins entities that had claims against the Debtors from pursuing litigation against the Ward Parties that arises from, is related to, or is based upon or derives from such claims or the Debtors' activities.  *See* Original Settlement Agreement § 5.  The Bar Order does *not* apply to litigation unrelated to claims against the Debtors or unrelated to the Debtors' activities.  *See id.*[9]  As to the second *Munford* factor, the bankruptcy court noted that Realan and Weeks-Grey had not filed proofs of claims in any of the Debtors' bankruptcy proceedings and had not filed any claims against the Ward Parties.  Doc. 1-3 at 7.  Moreover, the bankruptcy court

---

Rule 7001(7).  *See Superior Homes*, 521 F. App'x at 898–99.  Therefore, the Appellants' reliance on a Fifth Circuit case, *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), is unavailing.

[9] Appellants' second assignment of error with respect to the Ward Settlement Agreement, *see* Appellants' Br. at 6, is therefore without merit.

observed that Realan and Weeks-Grey failed to present evidence of specific claims they might have against the Ward Parties or the likelihood of success of those claims. *Id.* While Realan and Weeks-Grey insist that they *did* articulate potential claims that they had against the Ward Parties in their objection to the initial version of the Ward Settlement Agreement, their identification of these claims was vague at best, did not provide supporting evidence for the claims, and did not indicate why the claims had a likelihood of success. *See* Doc. 2-3. Accordingly, the bankruptcy court was correct in concluding that Realan and Weeks-Grey failed to demonstrate a likelihood of success on claims they had against the Ward Defendants, if indeed any such claims existed. *See In re Solar Cosmetic Labs, Inc.*, No. 08-15793-BKC-LMI, 2010 WL 3447268, at *3 (Bankr. S.D. Fla. Aug. 27, 2010) (approving a settlement agreement containing a bar order where the nonsettling defendant failed to provide a plausible basis for any claims against the settling defendants).[10]

With respect to the third *Munford* factor, the bankruptcy court was undoubtedly correct in finding the Ward Litigation to be complex. Doc. 1-3 at 6. The Ward Litigation was a multifaceted litigation involving the 36 related Debtors, various interrelated judicial proceedings, thousands of financial transactions, and voluminous electronic and paper records. Doc. 4 at 48–49. Finally, as to the fourth factor, the bankruptcy court correctly observed that without the Bar Order, the Ward Parties' resources were likely to be depleted as they would face continuing litigation costs in the multiple lawsuits against them. Doc. 1-3 at 6. Moreover, without the Bar Order, the Trustee would have to compete with the Bond Safeguard Parties in obtaining a recovery from the Ward Parties, and the Bond Safeguard Parties were already further along in the Ward Litigation, having obtained pre-judgment writs against the Ward Parties in the Georgia Writ Action and the Florida

---

[10] Appellants' ninth assignment of error with respect to the Ward Settlement Agreement, *see* Appellants' Br. at 18, is therefore without merit.

Garnishment Action.   Thus, the Trustee would risk further depletion of the Ward Parties' resources.  Accordingly, each of the *Munford* factors weighs in favor of approving the Bar Order, and the bankruptcy court did not err in finding the Bar Order to be fair and reasonable.

Having made this determination with respect to the Bar Order, the Court now turns to the remainder of the Ward Settlement Agreement.  The bankruptcy court was required to consider the four *Justice Oaks* factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Justice Oaks*, 898 F.2d at 1549.  This Court will not reverse the bankruptcy court's approval of the Ward Settlement Agreement unless the agreement fell "below the lowest point in the range of reasonableness." *Martin*, 490 F.3d at 1275.

The Court has already upheld the bankruptcy court's finding as to the complex nature of the Ward Litigation, and there is no doubt that continuing the Ward Litigation would add significant expense and delay to the Debtors' bankruptcy proceedings.  As such, the third *Justice Oaks* factor weighs in favor of approval of the Ward Settlement Agreement.  These considerations also have a bearing on the first factor, the probability of success in the Ward Litigation.  Given the complex nature of the Ward Litigation, the Trustee's chances of succeeding in the litigation would be uncertain at best.  Moreover, any "success" might actually be a pyrrhic victory due to the high costs of the litigation and the potential difficulties in collecting on any judgment, as discussed below.  Accordingly, the first *Justice Oaks* factor also weighs in favor of approving the Ward Settlement Agreement.

Appellants focus most of their argument on the second and fourth factors.  As to the second factor, Appellants maintain that the Trustee did not provide sufficient evidence that collecting a

judgment from the Ward Parties would be difficult.  *See* Appellants' Br. at 13–14.  Appellants point to the Trustee's representations that Robert Ward had approximately $3,000,000 in a bank account as of 2009, which dissipated to roughly $100,000 by 2011.  *See id.*  Appellants assert that the Trustee has not adequately explained how these assets dissipated, with the implication that Robert Ward may have additional assets which are capable of collection.  *See id.*  Appellants also point to evidence that the Ward Parties had a homestead in Atlanta.  *See id.*  They note that Georgia's homestead exemption only protects homesteads in an amount up to $21,500 for single debtors and $43,000 for joint spousal debtors.  *See id.* at 14 (citing Ga. Code Ann. § 44-13-100(a)(1)).  Thus, Appellants assert that the homestead could provide an additional source of funds. *See id.*

Contrary to Appellants' contentions, the Trustee has presented overwhelming evidence that collecting on any judgment against the Ward Parties would be very difficult.  In 2011, Robert Ward, 63 years old at the time, was convicted of murdering his wife and sentenced to 30 years in prison, with no possibility of serving fewer than 25 years.  *See* Anthony Colarossi, *Bob Ward Sentenced to 30 Years in Prison for Wife's Murder*, Orlando Sentinel, Dec. 16, 2011.  As noted previously, Robert Ward's bank account had diminished to $100,000 by 2011, apparently due to the cost of his criminal defense attorneys.  *See* Doc. 4 at 50.  His daughters, who were named as defendants in the Ward Litigation, are unemployed students, and therefore collecting any substantial amount from them would be difficult.  *See id.* at 49.  Moreover, the Bond Safeguard Parties, who have hired experts in an extensive attempt to locate assets of the Ward Parties, have had very limited success in their collection efforts.  *See id.* at 50–51.  To date, the Bond Safeguard Parties, which are allegedly owed $41 million by the Ward Parties, have only been able to levy on one used automobile, freeze $300,000 in a bail bond surety account, freeze $150,000 in a law

firm's trust account, and obtain $300,000 in a settlement, which is being contested in the Bond Safeguard Lawsuits.  *See id.*  Furthermore, the Trustee would have to compete with the Bond Safeguard Parties to collect any assets that may remain.  As it is clear that collecting from the Ward Parties would be a daunting task, the second *Justice Oaks* factor weighs in favor of approving the Ward Settlement Agreement.[11]

With respect to the fourth factor, Appellants argue that the bankruptcy court erred in finding the Ward Settlement Agreement to be in the best interest of creditors, mainly because the Ward Settlement Agreement did not specify how settlement proceeds would be allocated among the 36 Debtors.  *See* Appellants' Br. at 14–18.  However, Appellants fail to cite to any legal authority requiring a settlement agreement to resolve allocation issues among estates.  Given that the Ward Settlement Agreement would result in a $925,000 payment to the Debtors' estates, the cooperation of the Ward Parties, and an end to the costly Ward Litigation, the Court cannot say that the Ward Settlement Agreement fell below the lowest point in the range of reasonableness in its benefit to creditors.[12]

Because an analysis of the four *Justice Oaks* factors reveals that the Ward Settlement Agreement did not fall below the lowest point in the range of reasonableness, the bankruptcy court did not abuse its discretion in approving the settlement.

### C.   The Bankruptcy Court Did Not Err in Approving the Euram Litigation Agreement

Appellants argue that the bankruptcy court erred in approving the Euram Litigation Agreement because, rather than providing any benefit to the Debtors' estates, the main purpose of

---

[11] Appellants' sixth assignment of error with respect to the Ward Settlement Agreement, *see* Appellants' Br. at 13–14, is therefore without merit.

[12] Appellants' seventh and eighth assignments of error with respect to the Ward Settlement Agreement, *see* Appellants' Br. at 14–18, are therefore without merit.

the agreement was to ensure that Trustee's counsel received its fees. *See* Appellants' Br. at 19–20. However, Trustee's counsel testified that, without the funding provided by the Euram Litigation Agreement, the Trustee would not be able to effectively pursue the Euram Litigation. Doc. 4 at 63, 78. Now, with the funding, the Trustee has the opportunity to obtain a settlement or award from the defendants in the Euram Litigation and thereby enhance the recovery for the Debtors' estates. Moreover, because the funding comes from the Bond Safeguard Parties, there is no risk of loss for the Debtors' estates. Thus, the Euram Litigation Agreement is a "win-win" for the Debtors' estates.

The true reason for Appellants' objection to the Euram Litigation Agreement is clear—they are defendants in the Euram Litigation. Appellants would therefore benefit from the Trustee being unable to pursue the Euram Litigation. However, it is the interests of the estates' creditors—rather than the Appellants' best interests—that are relevant to approval of the settlement. *Justice Oaks*, 898 F.2d at 1549. As explained above, the Euram Litigation Agreement provides an obvious benefit to the Debtors' estates. Thus, Appellants' attempt to overturn the agreement on these grounds is without merit.

Appellants also incorrectly argue that the bankruptcy court should have examined the Euram Litigation Agreement under the standard for a sale of the estates' rights outside the ordinary course of business under 11 U.S.C. § 363(b)(1). *See* Appellants' Br. at 21–24.[13] Contrary to Appellants' arguments, the Trustee is not transferring control over the Euram Litigation to the Bond Safeguard Parties. The Euram Litigation Agreement expressly provides that the Trustee maintains ultimate decision-making authority over the Euram Litigation, unless the Bond

---

[13] Section 363(b)(1) provides, in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."

Safeguard Parties exercise their "buy-out" rights under the agreement.  *See* Euram Litigation Agreement § II(a)(2).  Under the buy-out clause, if the Bond Safeguard Parties object to any proposed settlement with the Euram Litigation defendants, they have the option to pay the Trustee the full amount of the proposed settlement in exchange for the right to maintain future settlement authority over that aspect of the litigation.  *See id.* § VII(B).  Thus, even where the Bond Safeguard Parties exercise their buy-out rights, the Trustee would receive the full amount of the proposed settlement that it negotiated.  Accordingly, the Euram Litigation Agreement does not constitute a sale of the estates' rights under 11 U.S.C. § 363(b)(1).

Finally, Appellants contend that the bankruptcy court should have examined the Euram Litigation Agreement under the standard for a secured financing arrangement under 11 U.S.C. § 364(c).  *See* Appellants' Br. at 24–25.[14]  However, the Euram Litigation Agreement does not grant the Bond Safeguard Parties priority over any administrative expenses, nor does it grant them a security interest in the Euram Litigation.  As such, Section 364(c) is inapplicable.

As Appellants have failed to present a viable basis for overturning the Euram Litigation Agreement, the bankruptcy court's approval of the agreement will be upheld.

---

[14] Section 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

1.      The Order of the bankruptcy court entered on January 22, 2013, which granted the

motions to approve the Ward Settlement Agreement and the Euram Litigation

Agreement is **AFFIRMED**.

2.      The Clerk is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on February 10, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties
United States Bankruptcy Judge Arthur B. Briskman